W. E. Baysden and Sarah K. Baysden v. Commissioner.
Baysden v. Commissioner
Docket No. 85716.
United States Tax Court
T.C. Memo 1963-74; 1963 Tax Ct. Memo LEXIS 270; 22 T.C.M. (CCH) 313; T.C.M. (RIA) 63074; March 14, 1963
*270 1. Part of excess of bank deposits over reported sales held to be additional sales rather than investments in the business from previously accumulated cash. 2. Petitioners not entitled to bad debt deduction for amount paid as guarantor of a customer's note. Amount of debt and worthlessness not proved. 3. Amount paid as guarantor of debt of corporation in which one of petitioners was 50 percent stockholder deductible as nonbusiness bad debt. 4. Petitioners are liable for addition to tax for negligence. Daniel R. Dixon, Esq., 808 Capital Club Bldg., Raleigh, N.C., for the petitioners. Wallace E. Whitmore, Esq., and Paul J. Weiss, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the year 1956 in the amount of $12,969.60, and an addition to tax for negligence under section 6653(a) [1] in the amount of $648.48. After hearing, respondent made assessment of the foregoing amounts but subsequently abated the assessment to the extent of $1,751.71 in tax and $87.59 in addition to tax to reflect concessions herein. Petitioners claim an overpayment of tax for the year 1956 in the amount of *271 $2,071.84. The issues for decision are: 1. Whether deposits in petitioners' bank account in the amount of $19,500 represented additional income in the form of unreported sales of their Richlands store or investments in the business from accumulated cash; 2. Whether petitioners are entitled to a bad debt deduction in the amount of $1,700; 3. Whether petitioners are entitled to a deduction in the amount of $6,500, representing either a loss incurred in a trade or business or a business bad debt in connection with the operation of the Tarawa Apparel Shop, Inc., of Jacksonville, North Carolina; and 4. Whether petitioners are liable for an addition to tax for negligence. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Richlands, North Carolina, during the period here involved. They filed a joint Federal income tax return for the taxable year 1956 with the district director of internal revenue, Greensboro, North Carolina. W. E. Baysden will be referred to hereafter as petitioner. Throughout the year 1956 petitioner operated *272 a general retail store in Richlands, a rural area. He had started in business in 1944. His income tax returns for the years 1944 through 1951 were examined by agents of respondent, and his net income for each of those years was computed on the basis of increases in net worth plus nondeductible expenditures, and deficiencies in tax and additions to tax were determined accordingly. Upon failure of petitioner to file a petition in this Court for a redetermination of the tax, the deficiencies were assessed on or about October 10, 1952, and petitioner paid the deficiencies as assessed. He secured the funds therefor from the following sources: Richlands bank account First-Citizens
Bank - Nov. 3, 1952 [1]
$ 8,229.71
Balance in the First National Bank
withdrawn - Dec. 17, 1952
3,410.09
Cashier's check from First-Citizens
Bank (bank loan) - Jan. 2, 1953
30,000.00
Checks drawn by petitioner on First-
Citizens Bank, Richlands, N.C.
11,312.02
Total payment (exclusive of minor
amounts of interest)
$52,951.82
The net worth statement *273 upon which the above determination of deficiencies was based reflected a net worth for petitioner at December 31, 1951, which included the following receivables as assets: W. I. and Erma Lee Taylor
$3,057.00
Newton Kornegay
68.76
T. C. and Gertie Sanford
1,500.00
L. H. Kennedy
1,000.00
T. C. Sanford
1,500.00
Mrs. R. D. Frazell
1,600.00
Also, an asset representing "Inventory" was shown at December 31, 1951, in the amount of $38,086.97. Other than the foregoing receivables, accounts receivable were not shown as assets and accounts payable were not specifically shown as liabilities. [2]
A cash register was maintained at the Richlands store. Cash sales and collections in cash and presumably by check on accounts receivable were rung up on the cash register and recorded on the register tape, as were collections of rent receipts. Cash purchases of merchandise, generally groceries, and cash payments of expenses with respect to rental property were made from the cash register. A daily summary of such cash receipts and cash payouts *274 was prepared by petitioner and given to a bookkeeper who periodically posted the total cash receipts and payouts in a journal. The bookkeeper also posted in this journal bank deposits from the bank statements received for the checking account at the First National Bank of Jacksonville, North Carolina, which was in the joint names of petitioners and which was used as a personal account as well as the account for the Richlands store. This journal was the only permanent record maintained by petitioner for the Richlands store. Sales on open account, that is, charge sales, were not rung up on the cash register when the sale was made. In addition to sales on open account, merchandise was sold on installment contracts. These sales were not run through the cash register when the sale was made. The installment contracts were discounted at the First National Bank of Jacksonville, which credited petitioner's account with a percentage of the face value of the installment contracts and the bank retained the balance in a reserve account. Petitioner employed a firm of certified public accountants to prepare his income tax returns for the years 1954 through 1960. An accountant from the firm audited *275 the records of the Richlands store for the year 1956. He found journal entries reflecting bank deposits which exceeded the journal entries reflecting sales taken from the daily summaries of cash receipts by more than $40,000. The accounting firm, in auditing the books for prior years, had also encountered the problem of reconciling recorded sales with bank deposits, in which event an attempt had been made to determine the source of the bank deposits and amounts for which no sources could be determined were added to sales and reported as income on the tax returns. In attempting to do this for the year 1956 the accountant prepared the following schedule: RECONCILIATION OF CASH
Debit
Credit
Total deposits - Checking account
$159,993.32
Deposited in reserve account
954.80
Total deposits
$160,948.12
Adjustments - account res. [1]
5,362.86
$ 7,840.60
Sales - receipt
$149,551.77
Less: Noncash items
Baysden - living expenses
2,600.00
Balance
$146,951.77
Less: Paid outs
20,953.73
Balance
125,998.04
Rents received
$ 2,880.00
Less: Paid out expenses
388.45
Balance
2,491.55
Sale of equipment
325.00
Finance reserve receivable
6,000.00
Cash difference in checks
1,736.29
Transferral of funds
1,500.00
W. E. Baysden - investment
$ 21,500.00
Less: Error
1,500.00 20,000.00
Unidentified money
442.44
Adjustments for error
22.94
$166,333.92
$166,333.92
*276 The accountant also attempted to determine the total sales on installment contracts. He was given copies of such contracts which totaled $6,922, but he was unable to reconcile this total with deposits to the reserve account during the year which amounted to $954.80. Because the bank retained 10 percent of the face amount of the installment contracts and deposited this retained percentage to the reserve account, the accountant computed sales on the installment contracts as 10 times the deposits to the reserve account, or $9,548, and added this amount to sales. In the reconciliation of cash set forth above, the item "Unidentified money" in the amount of $442.44 represents the amount of receipts of the Richlands store deposited in the bank account for which the accountant could determine no source. He therefore concluded that the amount might be unrecorded sales, and he added the amount to income by making a journal entry to represent unrecorded sales in the amount of $9,990.44, which was the *277 total of the accountant's estimate of sales on installment contracts in the amount of $9,548, plus "Unidentified money" in the amount of $442.44. The item in the foregoing reconciliation of cash termed "W. E. Baysden - investment" is an adjustment based on information given the accountant that petitioner made investments in the Richlands store during 1956 in the amount of $21,500 from previously accumulated cash and that consequently the difference between recorded sales and bank deposits, which could not otherwise be accounted for, was attributable to such investments rather than unrecorded sales. The accountant made the following journal entry in the records of the Richlands store to reflect the purported investment: Debit
Credit
Cash
$21,500.00
W. E. Baysden, investment
$21,500.00 No record of this investment appeared in the books and records of the Richlands store, but sometime before his return for the year 1956 was prepared petitioner furnished the accountant a small black memorandum book in which petitioner purportedly maintained a record of investments which he made in the Richlands store. This book, when introduced in evidence, contained some notations entered in ink under date *278 of 1951 on the first few unnumbered pages and on the page numbered 55, and on pages numbered 1 and 2 appeared the following in pencil: 1956
Advs to Store
Jan. 25
$ 3,000.00
Feb. 13
1,000.00
Feb. 25
900.00
Mar. 12
400.00
Mar. 22
1,000.00
Apr. 9
900.00
Apr. 19
2,000.00
Apr. 28
700.00
May 28
1,000.00
June 9
300.00
July 9
900.00
July 21
800.00
July 23
500.00
July 30
600.00
Aug. 20
1,500.00
Sept. 28
1,000.00
Oct. 12
500.00
Oct. 15
1,000.00
Oct. 24
1,500.00
Nov. 13
1,000.00
Nov. 26
1,000.00
Total
$21,500.00 There were no other entries in the book. During examination of petitioners' return for the year 1956, the journal entry by which the amount of $21,500 was shown as a credit to "W. E. Baysden - investment" was found by the examining officer who was given a typewritten list of the above notations from petitioner's memorandum book. Subsequently, the examining officer was shown the book with the above notations. Deposits and credits to petitioners' bank account at the First National Bank of Jacksonville for the Richlands store on or near the dates listed in petitioner's memorandum book as set out above were as follows: Date [1]
Cash
Checks
Total
Jan.
3
$1,693.64
$1,693.64
21
564.37
564.37
23
1,537.83
1,537.83
25
$ 500.00
3,080.77
3,580.77
27
100.00
148.87
248.87 [2]
Feb.
9
455.56
100.00
555.56
13
100.00
1,528.11
1,628.11
13
50.00
205.39
255.39
14
100.00
209.37
309.37
16
100.00
314.15
414.15
23
200.00
226.01
426.01
24
192.66
192.66
25
100.00
844.00
944.00
28
637.19
637.19
Mar.
12
297.47
297.47
12
430.00
497.57
927.57
15
245.82
245.82
21
440.13
440.13
22
1,758.49
1,758.49
Apr.
9
300.00
935.96
1,235.96
10
219.21
219.21
11
70.00
167.39
237.39
19
2,000.00
2,000.00
28
200.00
709.82
909.82
30
725.81
725.81
May
28
500.00
778.64
1,278.64
29
144.40
144.40
31
185.00
185.00
June
9
100.00
71.39
171.39
9
300.00
715.28
1,015.28
11
703.38
703.38
12
150.50
150.50
14
50.00
162.58
212.58
July
9
320.00
1,183.56
1,503.56
10
346.75
346.75
12
260.00
79.70
339.70
21
1,433.34
1,433.34 [3]
23
700.00
406.57
1,106.57
25
95.00
115.75
210.75
26
175.63
175.63
30
600.00
600.00
30
500.00
855.85
1,355.85
31
50.00
132.25
182.25
Aug.
2
$ 250.00
$ 94.78
$ 344.78
18
260.00
53.37
313.37
20
515.00
1,287.40
1,802.40
22
165.00
165.02
303.02
Sept.
26
350.00
77.32
427.32
28
1,000.00
1,000.00
28
300.00
754.35
1,054.35
Oct.
12
800.00
966.85
1,766.85
15
300.00
1,805.10
2,105.10
17
300.00
200.25
500.25
24
90.00
150.00
240.00
24
1,500.00
1,500.00 [4]
25
1,037.40
1,037.40
26
150.00
185.68
335.68
Nov.
13
100.00
180.21
280.21
13
6,000.00
6,000.00 [5]
14
100.00
91.10
191.10
15
45.00
504.64
549.64
26
250.00
1,271.76
1,521.76
27
100.00
86.61
186.61
*279 On their income tax return for 1956, petitioners reported the following net income from the Richlands store: Gross sales
$152,471.95
Less: Sales tax
2,198.70
Net sales
$150,273.25
Cost of goods sold: Beginning inventory
$ 17,188.36
Merchandise purchases
124,846.41
Freight
372.74
Total
$142,407.51
Less: Ending inventory
21,706.06
120,701.45
Gross profit
$ 29,571.80
Other income: Rent
2,880.00
Total
$ 32,451.80
Expenses
31,410.53
Net profit
$ 1,041.27
In the statutory notice herein, respondent determined that petitioners understated income by omitting sales of the Richlands store in the amount of $21,500, the amount of the adjusting journal entry referred to above. Respondent now concedes that, of this amount, the sum of $2,000 represents a transfer of funds between petitioner's stores and does not represent sales. Petitioners concede *280 that the amount of $1,500 does represent omitted sales and additional income. Income from the Richlands store was computed by the accrual method. No accounts receivable ledger was maintained. Accounts receivable were evidenced by copies of tickets which were given to the customer when he paid his account. The accountant totaled charge tickets at the end of the year to arrive at ending accounts receivable. If such total exceeded the total of accounts receivable at the beginning of the year, the increase was added to sales, and sales were also adjusted for a decrease in accounts receivable. A tobacco farmer, Roy Humphrey (hereinafter called Humphrey), who had a 111-acre farm in the vicinity of Richlands, was a regular customer at petitioner's Richlands store. He charged food and supplies and was sometimes advanced money at the store. The charges and advances were carried on open account. Typical [3] of the charge tickets were the following: Date
Balance
Charges
Credits
1955
Jan. 11
$ 448.23
$ 11.07
Jan. 11
459.30
1,630.17 [1]
391.24 [2]
Feb. 21
2,535.05
6.32
Aug. 31
3,914.04
93.50 [3]
Sept. 23
4,057.25
243.43 [4]
$ 674.57
18.57
Oct. 11
3,656.73
21.08
Nov. 17
3,694.22
2,500.00 [5]
1956
Feb. 7
1,285.23
17.07
Mar. 17
1,302.30
96.00 [6]
1,100.00 [7]
Nov. 10
316.40
6.28
Dec. 21
375.74
30.63
3.00
1957
Jan. 2
416.46
3.80
June 30
1,245.34
22.50
Sept. 18
2,582.16
493.50
1958
Jan. 4
918.49
5.38
*281 Humphrey generally made payments on account when he sold his tobacco. In 1951 Humphrey bought a tractor from CRV Motor Company, Inc. Petitioner orally agreed with the seller to pay for the tractor if Humphrey did not. Humphrey fell behind in his payments and on January 11, 1955, Humphrey gave a promissory note or bond to CRV Motor Company, Inc., for the balance of the purchase price due on the tractor. At Humphrey's request, petitioner signed the note or bond as an accommodation maker or endorser. Humphrey gave petitioner a deed of trust on his 111- acre farm, dated December 21, 1954, to secure payment of the amount of $2,500, payable October 1, 1955. This deed of trust was recorded on January 11, 1955, and is marked "paid" March 3, 1960. In September 1956 petitioner paid CRV Motor Company, Inc., $1,700 *282 because of his endorsement of Humphrey's note or bond. On his 1956 income tax return petitioner claimed a deduction for bad debts with regard to the Richlands store in the amount of $6,500, of which the amount of $1,700 represented what petitioner had paid CRV Motor Company, Inc., in discharge of the obligation on Humphrey's note or bond. The deduction in the amount of $1,700 was claimed on the return for 1956 because of petitioner's conclusion that Humphrey had had a poor tobacco crop that year. On petitioner's return for 1955 and 1956 petitioner's occupation was reported to be "Merchant" and "Retail Merchant." In 1956 he operated the Richlands store as well as the Baysden Furniture Co. in Jacksonville, North Carolina. The Baysden Furniture Co., which he operated as a proprietorship, was the result of the consolidation of two stores which he opened in Jacksonville in 1954 to take over the furniture and appliance business of the Richlands store, Baysden TV & Furniture Company and Baysden Appliance Center, with a store which he bought in December 1955, the Quinn-Miller Furniture Company. He borrowed $55,000 in 1955 to buy the latter company. In 1951 petitioner invested $3,500 in a *283 drive-in theater which he operated as a partnership with a partner, Venters. About a year later he sold out to his partner for $3,500. At some time not identified in the record petitioner and Carl Frazelle, as partners, operated the Paradise Drive-In Theater in Richlands which they closed down when they began operating the Sunset Drive-In Theater in Richlands. The latter theater was being operated at the date of the hearing. In 1957 petitioner purchased a building for $8,500 and operated the Baysden Supermarket in it until 1958 when, after making some capital improvements, he sold it. In 1958 he purchased a grocery business known as Bush's Superette, and a building, and operated this grocery business for about a year as a proprietorship. In 1953, petitioner invested $3,000 to acquire 50 percent of the stock of Tarawa Apparel Shop, Inc. (hereinafter called Tarawa), a corporation which petitioner and the other stockholder, Capps, formed to operate a clothing store about 7 miles east of Jacksonville. Petitioner was vice president and a director of Tarawa. He hired several managers for the shop in succession and he ran the business much as he did his proprietorship operations. It lost *284 money, and in 1955 petitioner claimed, as a capital loss, the sum of $3,000 by reason of the worthlessness of his shares of stock in Tarawa. Tarawa borrowed the sum of $13,000 from the First-Citizens Bank & Trust Co., Jacksonville, evidenced by a note dated August 24, 1955, and payable October 24, 1955. Petitioner and the other stockholder were required to, and did, endorse this note. On January 24, 1956, petitioner was called upon to pay the sum of $6,587.50 to the payee of the note. This amount represented his share of the liability of the endorsers for principal and interest. Petitioner's check in payment thereof cleared his account on January 26, 1956, when the amount of $6,587.50 was charged to the account. Ultimate Findings of Fact Petitioners realized gross income from the Richlands store in 1956 in the amount of $19,500 in addition to that reported by them. Petitioners are not entitled to a bad debt deduction in connection with the Humphrey transaction for the year 1956. Petitioner was not engaged in the business of financing and promoting business enterprises in 1955 or 1956. At least part of the deficiency due from petitioners for 1956 was due to negligence. Opinion The *285 first issue is whether petitioners realized income, in addition to that reported by them for 1956, representing sales of the Richlands store. The issue arises out of petitioner's original claim that $21,500 of the excess of bank deposits from the Richlands store in 1956 over recorded sales of the store for that year represented previously accumulated cash fed into the business by petitioner in 1956 as an investment. Respondent determined that the $21,500 represented unreported sales from the store. Respondent now concedes that, of the $21,500, the amount of $2,000 represents a transfer of funds between bank accounts; and petitioners concede that the amount of $1,500 represents additional income. Whether petitioners realized additional income in the amount of the remaining $19,500 is a question of fact, and petitioners have the burden of proof on the issue. We cannot find that they have produced sufficient evidence to sustain that burden. Both parties seem to agree that the issue turns on the correct amount of sales of the Richlands store. However, it would appear to be impossible to accurately determine the correct amount of these sales from the books and records maintained by petitioner *286 or from any other recorded information available. Gross sales were reported on the return for 1956 to be $152,471.95. So far as we can discern from the evidence, that figure was arrived at as follows. Cash receipts [4] and cash payouts were run through the cash register in the store. Such cash receipts included collections on accounts receivable, cash sales, and rentals. Cash payouts included purchases of merchandise and expenses of rental property paid in cash. Petitioner made a recapitulation of cash receipts and payouts, presumably from the register tape, and gave the recapitulation to a bookkeeper whom he employed to make entries to a journal which the bookkeeper maintained. This journal was apparently the only accounting "book" maintained for the store. At least with respect to purchases and sales, income of the Richlands store was reported on the accrual method. However, sales on open account, which were not rung up on the register until there were collections on the accounts, were not entered in the journal as such at the time *287 the sales were made. It was up to the auditor at yearend to reconstruct these sales on open account. According to the testimony of both the revenue agent and petitioner's accountant, the accounts receivable were "inventoried"; that is, the balances due on tickets evidencing the accounts were totaled. But it appears that when a customer paid his bill he was given the tickets for his account and thereafter there was no way to audit the total of accounts receivable for any particular day since the tickets, which varied from day today, were not available at any succeeding workday. The record does not indicate how or whether petitioner's accountant checked the accuracy of the total accounts receivable for December 31, 1956. Also, it was necessary to reconstruct sales on installment contracts for the year. These sales did not appear on the journal because they were not run through the cash register. Petitioner's accountant reconstructed such sales by reference to petitioner's copies of installment sales contracts and to the total deposits to the reserve account for the year. For 1956 he could not reconcile the face value of the copies of contracts with the deposits so he used the latter *288 as a basis for reconstructing installment sales. He computed such sales to be $9,548, 10 times the deposits to the reserve account, since he realized that the bank, which discounted petitioner's sales contracts, deposited 10 percent of the face value thereof to the reserve account. [5] He made a closing entry in the journal indicating additional sales in an amount which included his estimate of installment contract sales in the amount of $9,548. For the accountant, reconciling cash receipts, per the cash register totals, with bank deposits was more difficult. *289 The bank deposits exceeded recorded sales by more than $40,000. It appears that he attempted to determine the source of the deposits which made up the difference, such as transfers of funds (in the amount of $1,500 for 1956); receipts from sales of capital assets (in the amount of $325); deposits from the reserve account ($6,000); income from rentals ($2,880) which was reported separately; and receipts from collections on accounts receivable reported as income in prior years. Although it is not clear from the evidence, it appears that the accountant, in making closing entries in the journal for 1956, found a discrepancy between sales as recorded in the journal and bank deposits for which he could ascertain no definite source, in the amount of $21,942.44. Of this amount, petitioner told him $21,500 represented accumulated cash he fed into the business as it was needed which ended up as deposits in the store bank account. To reflect this investment, the accountant made the journal entry in question. He made another journal entry adding $442.44 to sales for the year. [6] While we cannot tie in sales, either gross or net after sales tax, as reported on the return with the *290 accountant's reconciliation of cash which is set forth in our findings, it is obvious that the accountant was required to reconstruct sales rather than to summarize sales from available records. It follows that there are no reliable records to substantiate with accuracy the sales figure as reported on the return. Thus, we cannot refer to any records of sales for proof that there is not properly includable therein the amount of $19,500 which is in controversy. It is the contention of petitioners that the journal entry reflects actual investments by petitioner in the business throughout the year; that the source of the funds invested was cash which petitioner had received from nontaxable transactions prior to 1956; and that the investments are evidenced by the entries in petitioner's small memorandum book which are set forth in our findings. Petitioners have adduced evidence respecting these transactions prior to 1956, many of which took place as early as 1952, but this evidence is largely irrelevant unless it can be determined that petitioner invested the cash in the Richlands store in 1956. Such a determination must rest ultimately upon the weight which can be accorded petitioner's *291 unsupported testimony and the entries in the memorandum book. It is upon this book that petitioners rely for support of their contention, and upon which the accountant based the journal entry crediting petitioner's investment with $21,500. We cannot accord to the book the weight necessary to prove petitioners' case. There is a strong suggestion from the appearance of the entries that they were made on a single occasion with the same pencil, rather than at different times as petitioner testified. Of course, if this is the case, the entries have no value as evidence of investments as records made contemporaneously with the events. Other evidence detracts from its evidentiary value. According to the testimony of petitioner, he put cash in the business as it was needed. This was done by putting cash in the drawer of the cash register and ultimately it would be deposited in the bank. There was other testimony indicating that he put some of the cash in the cash register and some was deposited directly in the bank account. Petitioner testified that he kept cash funds in three places: He had about $100 in cash in the cash register each morning to take care of cash needs during the day; he *292 had about $1,000 in a cash box to which the employees did not have access; and, at the beginning of 1956 he had some $21,500 (the cash from which the purported investments were made) in a safe. From his testimony we take it that petitioner considered that the requirements for cash for purchases or for cashing checks would not exceed $100 plus cash receipts during a particular business day. Cash purchases were for minor items of groceries such as soft drinks and bread and apparently did not exceed $20,953.73 in 1956. Also, petitioner did not want to keep large amounts of cash in the cash register which was accessible to several employees. All this would make it likely that if petitioner were to invest his cash in the business at a particular time he would do so by depositing it directly in the bank account rather than by placing it in the drawer of the cash register. If he deposited the cash in the bank account the deposit ticket would reflect it, of course, as currency. But even if petitioner made the investment of cash by placing the cash in the drawer of the cash register, it would, as he stated, be deposited in the bank account within 2 or 3 days. It would appear on the deposit *293 ticket as currency at such time, unless it had been used to cash checks in the meantime. The evidence does not indicate petitioner cashed many or large checks at his Richlands store. It would follow that there should be some correlation between the entries in petitioner's memorandum book and deposits of currency to the bank account. The connection is doubtful. For example, the largest single investment of cash per the entries in the memorandum book was $3,000 on January 25, 1956. Total deposits for the month of January were not above the average for other months. There was a deposit to the account on January 25, 1956, in the amount of $3,580.77, but of this amount the sum of $500 was in currency; the remainder was in checks which were more likely received on accounts receivable than checks which petitioner had cashed. The two succeeding deposits included currency of only $100 each. The amount of $1,000 was supposedly invested on February 13; the bank deposit of that date (or February 11 when the deposit ticket is dated) included only $100 in currency, as did the succeeding deposit on February 14. The amount of $900 was shown invested on February 25; the deposit of that date was $944, *294 of which only $100 was in currency, and there were no succeeding deposits of currency in February. Petitioner reduced his bank deposits in February by withholding on his deposit tickets a total of $627.85 in cash from checks deposited. Another $1,000 is claimed to have been invested on March 22, and petitioners point to a bank deposit of $1,758.49 on that date. But none of this deposit was in currency. An analysis of petitioner's monthly bank deposits at dates on or near the dates when claimed investments were made as set forth in our Findings of Fact, does not disclose the correlation that might be expected if the entries in the memorandum book were accurate. Two exceptions to this pattern are a deposit of $2,000 in currency on April 19, the date when an investment of $2,000 is recorded in petitioner's book, and a deposit of $1,000 in currency on September 28, the date when an investment of $1,000 is recorded in petitioner's book. But these isolated instances cannot overcome the inference established by viewing the deposits in their entirety, which is that entries in the memorandum book were made after reference to total bank deposits on particular days but without taking into account *295 deposit tickets. It is noted that a check for $1,000 cleared the account on April 3 and another for $1,000 cleared on April 16. There could have been withdrawals. Entries dated in 1951 appear in the memorandum book. Petitioner has testified that he did not make such entries, but if the book was maintained as a record of petitioner's investments in the Richlands store, it would be likely that there would be recorded in it his personal loans or investments of which there is evidence. Yet there are no such entries made by petitioner. Petitioners argue that the ratio of gross profits to sales reported for 1956 is consistent with such ratios for other years and that to add $19,500 to sales and to gross profit for 1956 would make the profit percentage for 1956 inordinate. But we have no information regarding computations for other years or the basis upon which such computations were made. In the absence of reliable sales records for the other years we cannot use these computations for comparison with 1956. Petitioner's testimony that he had $21,500 in cash at January 1, 1956, and that he invested it in the Richlands store in 1956 as evidenced by entries in the memorandum book is questionable. *296 He borrowed money in 1955 at a time when he purportedly had the cash in his possession. Further doubt is cast upon the accuracy of the memorandum book by the concessions of petitioners that the amount of $1,500 of the $21,500 originally in question represented an understatement of sales and the concession of respondent that the amount of $2,000 represents a transfer of funds. If petitioner's testimony and the entries in the book are accepted as accurate, the amount of $21,500 would have come solely from cash which petitioner had accumulated before 1956 and the concessions would be incorrect. No reason has been advanced why petitioner made the investments in the Richlands store in 1956, except that he said that it was needed. But the return for 1956 as filed reports an operating profit for the Richlands store. It also shows an increase in inventory of only $4,517.70, and, according to the accountant's cash reconciliation, there was a decrease in accounts receivable in the amount of $2,477.74, which would furnish cash for an inventory increase. Depreciation schedules on the 1956 return indicate no large expenditures for depreciable assets. Two sizable checks cleared the account in January *297 1956, but the bank balance at January 1, 1956, was $24,857.21. We need not discuss the evidence concerning the transactions by which petitioner allegedly obtained $16,500 in cash prior to 1956. The question is whether petitioners have carried their burden of proving that the amount in question was not additional income as determined by respondent. Upon the entire record, we must hold that they have not sustained this burden of proof. Accordingly, we have found that petitioners realized additional unreported income in the amount of $19,500 for the year 1956. The second issue is whether petitioners are entitled to a deduction for bad debts for the Richlands store for 1956 in the total amount of $6,500 as claimed on their return. Respondent allowed the deduction in the amount of $4,800. The difference is due to disallowance of the $1,700 petitioner paid to CRV Motor Company, Inc., in 1956 as accommodation maker or endorser of a note executed by Humphrey, which petitioner included in bad debts claimed on the return. Petitioner argues that the amount is deductible under section 166(a). Humphrey maintained a running account at the Richlands store, charging groceries and supplies. In 1951 *298 Humphrey bought a tractor from CRV Motor Company, Inc., and petitioner agreed orally with the seller to pay for it if Humphrey did not. On January 11, 1955, Humphrey executed a promissory note or bond in favor of the seller, presumably in the amount of $1,630.17, and petitioner signed the instrument as accommodation maker or endorser. At or about the same time Humphrey gave petitioner a deed of trust on his 111-acre farm securing the sum of $2,500. On January 11, 1955, petitioner charged the amount of $1,630.17, identified as being for the account at CRV Motor Company, Inc., plus interest for 3 years in the amount of $391.24, to Humphrey's running account. After this charge the balance shown as due to petitioner on Humphrey's account was $2,480.71. Additional charges were made to the account and on a ticket dated November 17, 1955, there was a credit of $2,500 as a payment on account in cash. Charges and credits to the account continued through the taxable year with which we are concerned and into 1958, so far as the evidence shows. Humphrey's deed of trust in favor of petitioner was not canceled until 1960. On March 17, 1956, the account was credited with $1,100 which apparently resulted *299 from Humphrey's assignment to petitioner of rentals to be paid by Bryan as lessee of Humphrey's farm. Petitioner paid the seller of the tractor the sum of $1,700 in September 1956, because of his endorsement of Humphrey's note or bond. This does not appear to have been charged to Humphrey's account. The balance of Humphrey's account with petitioner was $409.37 as of December 21, 1956, and it was roughly this amount at December 31, 1956. There is no evidence that the account was reduced at any time during 1956 by charging off the $1,700 paid on the note. Petitioner offered no evidence to show that he made any effort to have Humphrey pay the $1,700 or that Humphrey was financially unable to do so. Nor were we given any reason why the deed of trust or at least the land behind it was not adequate security for any amount Humphrey might have owed petitioner at the end of 1956. Petitioner's only explanation for claiming the $1,700 as a deduction in 1956 was that Humphrey had had a bad tobacco crop that year. However, petitioner continued to extend Humphrey credit, and there has been no showing what efforts, if any, were made to collect the purported amount from him. In fact, there has been *300 no showing that Humphrey owed petitioner $1,700 at the end of 1956. The evidence indicates the contrary. As best we can determine from the evidence, petitioner charged Humphrey's account for the amount of the note at the time he signed it, in January 1955. As Humphrey paid on the account it would therefore seem that the primary obligation on the note became that of petitioner. So when petitioner paid the $1,700 in September 1956, he was in effect paying over moneys that Humphrey had previously paid him, in part at least. The balance of the account according to the only evidence presented, was only $409.37 on December 21, 1956, and was $416.46 on January 2, 1957. There is no evidence that Humphrey owed petitioner any more than this amount at the end of 1956. The fact that the Bryan rental which had been credited to Humphrey's account had not been paid by the end of 1956 would not change the situation because petitioner was looking to Bryan for payment of this amount. Petitioners having failed to prove that Humphrey was in fact indebted to petitioner in any amount which became worthless or recoverable only in part in 1956, the bad debt deduction claimed by petitioners for 1956 must be *301 reduced by the amount of $1,700 as determined by respondent. The third issue is whether petitioners are entitled to a business bad debt deduction in the amount of $6,500 arising out of petitioner's payment, as guarantor, of $6,500 to the creditor of Tarawa in 1956. That petitioner made the payment in 1956 and that his resulting obligation from Tarawa was worthless in 1956 is undisputed, and respondent concedes that petitioners are entitled to a bad debt deduction in the amount of $6,500 in 1956. But respondent contends that it was a nonbusiness bad debt, and that the deduction for it is accordingly limited under section 166(d). [7] *302 Petitioners, who did not claim the deduction on their 1956 return, contend herein that the loss was on a business bad debt, or in the alternative, was a loss incurred in petitioner's trade or business and deductible under section 165. [8]
Petitioners acknowledge that , appears to enunciate the controlling law on this issue, but claim that the principle *303 announced in the Putnam case does not apply here because the primary debtorcorporation was nonexistent at the time petitioners paid the debt so the subrogation theory applied in Putnam is inapplicable here. We need not decide the legal question involved [9] because the factual basis upon which it is premised, that Tarawa was nonexistent when the debt was paid, is not supported by evidence. It is likely that Tarawa was insolvent and dormant in 1956 when petitioner paid the creditor but there is no evidence that it had been liquidated nor that it was not then technically in existence - at least as much in existence as was the corporate debtor in Putnam, in which the sole stockholder wound up the affairs of the corporation and liquidated its assets some 18 months before he made the payment to the creditor of the corporation pursuant to his guaranty agreement. We think the principle of the Putnam case is applicable here and requires the conclusion that the $6,500 is deductible as a bad debt under section 166 and not as a loss under section 165(c). ; , affirmed per curiam *304 (C.A. 3, 1962).
Thus, the only question is whether the debt, as regards petitioner, was a business debt. [10] Petitioners argue that it was since petitioner was in the trade or business of financing and promoting business enterprises such as Tarawa. The evidence, however, does not show that petitioner's activities were such as to justify the finding that either when the debt was incurred by Tarawa or when petitioner was called upon to make payment, petitioner was in the trade or business of financing, promoting, organizing, or lending money to such enterprises. It has been judicially recognized, of course, that a taxpayer may be engaged in such a trade or business and that an obligation in his favor from one of the enterprises may be a business debt. See, e.g., ; . But exceptional circumstances must exist to differentiate a creditor in such cases from either a mere investor or one who is simply engaged in the trade or business of the corporation which he finances. , affd. (C.A. 4, 1960); ; *305 . Those exceptional circumstances are not present in this case. Petitioner reported on his return for 1956 that he was a retail merchant, and we believe that that business is the only one in which he was engaged during the period with which we are concerned. He operated, as sole proprietor, the general store in Richlands, and in Jacksonville he operated Baysden Furniture Company, which resulted from the consolidation of his appliance store, his furniture store (both of which were offshoots of the Richlands store), and the Quinn-Miller store which he bought in 1955. In 1951 he became a partner with the owner of the land near Jacksonville and together they operated a drive-in theater. Petitioner sold out to his partner in 1952 for $3,500, the amount which he had originally invested. He and Carl Frazelle as partners, at some time not disclosed by the record, operated the Paradise *306 Drive-In Theater in Richlands, closed it when they lost money, and opened the Sunset Drive-In Theater which was being operated at the time of the hearing. In 1953, petitioner invested $3,000 in 30 shares of the stock of Tarawa. This was the only corporation in which he invested. He was vice president but he and Capps hired several managers until the corporation became inactive in 1955, the year in which petitioner reported a capital loss resulting from the worthlessness of the 30 shares. Petitioner also operated two grocery stores for a short time after 1956, one of which he closed down and other of which he sold. The record does not show whether he made a profit. The above activities and investments of petitioner do not, in our opinion, constitute a separate business of promoting and financing business enterprises. Rather, petitioner was investing in and conducting separate business ventures. Nor does the evidence indicated that petitioner was in the business of lending money to finance enterprises. There is no evidence of such lending activity except the open accounts petitioner carried at his Richlands' store - and these were related to petitioner's business as a retail merchant. *307 Petitioner's guarantee of Tarawa's loan was not related to any business activity of petitioner, separate and apart from the business of Tarawa, but was made in connection with his investment in the stock of Tarawa. Petitioner's loss as a result of the payment of Tarawa's debt pursuant to the guarantee is deductible only as a nonbusiness debt which became worthless in the year 1956. The final issue is the liability of petitioners for the addition to tax for negligence. While this issue is raised by the pleadings and evidence relating to it was adduced at the trial, on brief petitioners appear to concede the point or are willing to have it turn on the resolution of the first issue heretofore discussed. In any event, petitioners have not presented evidence sufficient to sustain their burden of proof on the issue, and there is evidence to support affirmatively the contention of respondent that part of the deficiency due for 1956 is attributable to negligence. This is particularly true here where, despite the lesson petitioner should have learned from the earlier assessment, the records he maintained were so inadequate his accountant had to reconstruct sales from bank deposits each year. *308 To take into account adjustments to which the parties have agreed, Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise noted.↩
1. This language is from the stipulation of the parties. Presumably, the "Richlands bank account" refers to the account for the Richlands store, as opposed to individual checking accounts.↩
2. Liabilities "per schedule" were shown at $23,176.24 at December 31, 1951. However, no schedule is attached. Possibly accounts payable were included in this group of liabilities.↩
1. This reconciliation was submitted as an exhibit and the meaning of this and other adjustments is not clear from the evidence. The statement apparently reflects adjustments made by the accountant.↩
1. Where legible, the date of deposit has been taken from stipulated bank records. In some cases, the date of the deposit ticket is not the same as the date of the deposit per bank ledger. ↩
2. Deposit ticket shows $248.97. ↩
3. Bank credited petitioner with 20 cents more than deposit or $1,433.54. ↩
4. Transfer from Baysden's furniture store to cover overdraft. ↩
5. Transfer from reserve account.↩
3. Rather than introduce all of the tickets, the parties introduced certain tickets representative of all those for the period. The above list includes only those having particular pertinence to the issue involved. ↩
1. "Account at CRV Motor." ↩
2. "Interest for three years." ↩
3. "Paid to CRV Motor Co." ↩
4. "Interest." ↩
5. "Paid on A/C by Cash." ↩
6. "Paid to CRV Motor Co." ↩
7. "Land leased to Freeman Bryan."↩
4. We assume this also includes payments received by check because checks made up a large amount of the deposits in the Richlands store bank account in 1956.↩
5. The parties have stipulated that the bank credited to petitioner's checking account "a percentage of the face value of the installment contracts and the bank retained the balance in a reserve account." The accountant testified that the retained percentage was 10 percent; in 1956 it amounted to $954.80. It would seem to follow that 90 percent of the face value was credited to the checking account, but in 1956 such credits totaled $6,188.70 (or - depending upon the amount of one credit which is, illegible - $6,189.70), which, of course, is not 90 percent of $9,548, the total based on the retained amount deposited to the reserve account.↩
6. See footnote 5.↩
7. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
8. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩
9. But see footnote 21 to .↩
10. Petitioner does not argue that the loss was incurred in a transaction entered into for profit, deductible under section 165(c)(2), and states on brief that whether the loss is deductible under section 165 or section 166, the business nature of the transaction must be shown.↩